IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:18-MJ- 533 |
| LUIS BONILLA-HERNANDEZ and ) | **UNDER SEAL** |
| ELIAZAR DURAN MOTA, a/k/a ) | |
| "JONATHAN" ) | |
| Defendants. ) | |

NOV - 7 2018

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Laura R. Calvillo, Special Agent of the Federal Bureau of Investigation (FBI), Washington, D.C., Field Office, Northern Virginia Resident Agency, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation and have been since March of 2016. I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency. Prior to joining the FBI, I was a Special Agent for the U.S. Army Criminal Investigation Division, and assigned to investigate violations of federal law to include violations involving child pornography and the sexual exploitation of children. Currently, as an FBI Special Agent, I investigate federal violations concerning kidnapping, child pornography, the sexual exploitation of children, human trafficking, and related offenses. I have gained experience through training and work related to conducting these types of investigations.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3. I have participated in the execution of search warrants and have sworn to affidavits

1

in support of search warrants and/or criminal complaints for kidnapping, child pornography, the sexual exploitation of children, human trafficking, and related offenses.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, observations of other law enforcement officers and agents involved in this investigation, and information provided by witnesses. All observations referenced below that I did not personally make were related to me by the persons who made such observations.

5. This affidavit contains information necessary to support probable cause for this application. Because this affidavit is being submitted for the limited purpose of establishing probable cause for this application, I have not included every detail known to the government. Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

6. I submit this affidavit in support of a criminal complaint and arrest warrant charging LUIS ADALBERTO BONILLA-HERNANDEZ ("BONILLA-HERNANDEZ") (a citizen of El Salvador) and "ELIAZAR DURAN MOTA" ("DURAN MOTA") (a citizen of Mexico), with interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952; coercion and enticement in violation of 18 U.S.C. § 2422(a), transportation in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2421; and bringing in and harboring certain aliens in violation of 8 U.S.C. § 1324.

## RELEVANT FEDERAL CRIMINAL STATUTES

7. 18 U.S.C. § 2421 prohibits a person from knowingly transporting any individual in interstate or foreign commerce with intent that such person engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense. 18 U.S.C. § 371 prohibits conspiracies to engage in such conduct.

8. 18 U.S.C. § 2422(a) prohibits a person from knowingly persuading, inducing,

enticing, or coercing any individual to travel in interstate or foreign commerce to engage in prostitution or in any sexual activity for which any person can be charged with a criminal offense. Section 2422(a) prohibits attempts to engage in such conduct as well. 18 U.S.C. § 371 prohibits conspiracies to engage in such conduct.

9. 18 U.S.C. § 1952 prohibits a person from traveling in interstate or foreign commerce or using "the mail or any facility in interstate or foreign commerce with the intent to (1) distribute the proceeds of any unlawful activity or ....(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity and thereafter performs or attempts to perform an act described in (1) or (3)." In pertinent part, "unlawful activity" means any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

10. 8 U.S.C. § 1324 prohibits a person, knowing and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, to transport and move said aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, for the purpose of commercial advantage and private financial gain. Section 1324 also prohibits conspiracies to engage in such conduct. *See* 8 U.S.C. §§ 1324 (a)(1)(A)(ii), (a)(1)(A)(v)(I) & (a)(1)(B)(i)).

## PROBABLE CAUSE

11. Detective Michael Roche of the Loudoun County Sheriff's Office initiated a human trafficking investigation in June of 2017 after receiving information from a confidential informant (CI 1) that LUIS ADALBERTO BONILLA-HERNANDEZ was involved in the sex trafficking of multiple women throughout Virginia. CI 1 had provided detailed and credible information in previous investigations, and the information provided in reference to this investigation lead to the

3

identification of BONILLA-HERNANDEZ and his residence.

12. CI 1 reported that BONILLA-HERNANDEZ advertised and offered prostitutes in exchange for money. The prostitutes are referred to as "Treinteras," a term derived from the Spanish word for thirty (treinta). "Treinteras" cater their services exclusively to Hispanic clients. "Treinteras" gained this assumed nickname based upon common knowledge amongst their clients that the usual price for any sex act performed is thirty dollars. The "Treinteras" were advertised through business cards advertising automotive services and through word of mouth.

13. CI 1 reported that BONILLA-HERNANDEZ ordered the females from a domestic supplier, at a price of three-hundred dollars per prostitute, using one of several cell phones he maintains to isolate his illegal activities from his personal communications. The prostitutes are shipped via Greyhound bus to the Washington D.C. Greyhound bus terminal, and BONILLA-HERNANDEZ picks them up and transports them back to his residence. BONILLA-HERNANDEZ offers his "Treinteras" to customers Monday through Saturday, and he functions as a promoter (for the business) and dispatcher. Clients contact BONILLA-HERNANDEZ directly on telephone number 571-525-8903 (SUBJECT TELEPHONE NUMBER 1) and provide their address, and he would dispatch a driver to transport the "Treintera" to the prostitution date. After the "Treintera" provided services and received payment, fifteen dollars would be provided to the driver which then goes directly to BONILLA-HERNANDEZ.

14. CI 1 reported that BONILLA-HERNANDEZ shuts down his operation on Sundays in order to switch out his inventory of prostitutes. The "Treinteras" are usually transported to, or picked up from, the Washington D.C. Greyhound bus terminal, an aspect of the business BONILLA-HERNANDEZ accomplishes by using his 2017 black Hyundai Santa Fe crossover SUV bearing Virginia license plate "VSP 6978," and a second vehicle registered in his name, a gold four door

2002 Toyota Camry bearing Virginia license plate "VGU 8700." The girls are transported to, and from, his residence on West Nettle Tree Rd, Sterling, VA. After arriving back at the residence on West Nettle Tree Road, the cars are parked on or near the premises. A second CI (CI 2) provided information relating to BONILLA-HERNANDEZ's prostitution business. CI 2 reported that he had been a customer, and he had the telephone number in his phone. That number was saved as "Treintona," which the CI 2 related had the same meaning as "Treintera," and the number was SUBJECT TELEPHONE NUMBER 1.

15. CI 2 reported that he had ordered prostitutes by texting or calling that telephone number, and he had paid approximately $35 to have sex with the prostitutes. Cellular telephone records corroborate that the telephone number belonging to CI 2 contacted the "Treintera" telephone number (SUBJECT TELEPHONE NUMBER 1) over a hundred times in a nine month period.

16. CI 2 reported that he ordered multiple prostitutes from the above telephone number over a period of several months. The last time the CI received a prostitute was sometime around September of 2017. He further reported that one of the girls he ordered appeared to be a 16-year old female from Venezuela. He also reported one female he ordered had attempted to solicit his help to get out of being a prostitute. CI 2 reported that he observed the prostitutes being transported in a black SUV and a gold Toyota Camry, and he identified the driver for both vehicles as BONILLA-HERNANDEZ.

17. BONILLA HERNANDEZ had two vehicles registered to him. One was a black 2017 Hyundai Santa Fe bearing Virginia registration license plate number "VSP 6978," and the other was a gold 2002 Toyota Camry bearing Virginia registration plate number "VGU 8700." BONILLA-HERNANDEZ had been observed by law enforcement driving both the black Hyundai and the gold Toyota transporting women believed to be "Treinteras."

18. On one occasion on August 17, 2017, law enforcement conducted a traffic stop on the Hyundai bearing Virginia registration license plate number VSP 6978. BONILLA-HERNANDEZ was driving the vehicle and a Hispanic female, FEMALE 1, was a passenger. FEMALE 1 was fully identified, and it was determined she is an illegal alien from Mexico. FEMALE 1 was observed at BONILLA-HERNANDEZ' residence with luggage on August 17, 2017 and departing his residence on August 20, 2017 with her luggage.

19. On the evening of October 20, 2017, an unidentified Hispanic female and BONILLA-HERNANDEZ were observed leaving the residence at approximately 7:13 p.m. in the Hyundai. Law enforcement observed BONILLA-HERNANDEZ transporting the female to multiple residences throughout the evening. The female typically exited the vehicle, entered a residence, and then exited the residence after approximately ten to fifteen minutes. BONILLA-HERNANDEZ remained in the vehicle for the majority of the stops, and he would usually park near the residence while the female was inside. BONILLA-HERNANDEZ would pick up the female from the residence, and they would proceed to the next residence.

20. On October 16, 2017, BONILLA-HERNANDEZ was observed carrying luggage from the Hyundai to the residence with an unidentified Hispanic female, FEMALE 2, following behind him. That same day, FEMALE 2 was transported by BONILLA-HERNANDEZ in the Hyundai to a store where she purchased condoms, KY jelly, and benzocaine, which is a topical anesthetic. Video surveillance of the purchase was obtained along with the store receipt.

21. During the week of October 16, 2017, BONILLA-HERNANDEZ was observed transporting FEMALE 2 from, and back to, his residence multiple times throughout the day and night via the use of the Hyundai. On the evening of October 17, 2017, FEMALE 2 and BONILLA-HERNANDEZ were observed exiting the residence and leaving in the Hyundai. They returned to

the residence throughout the evening, but always departed in the Hyundai. On October 22, 2017 at approximately 2:11 am, FEMALE 2 was observed departing BONILLA-HERNANDEZ' residence with her luggage. She departed in the Hyundai with BONILLA-HERNANDEZ.

22.     On November 6, 2017, law enforcement observed BONILLA-HERNANDEZ transporting a Hispanic female, FEMALE 3, to multiple residences in the Hyundai. FEMALE 3 would enter the residence alone, stay for approximately 15 minutes, and return to BONILLA-HERNANDEZ' vehicle.

23.     The pattern of behavior for FEMALE 1, FEMALE 2, and FEMALE 3 is consistent with the sex trafficking pattern of behavior described by the CIs. Since Loudoun County Sheriff's Office initiated the investigation, more than 10 different Hispanic females have been observed arriving at the residence, staying at the residence for approximately one week, and then departing the residence.

24.     CI 2 reported that BONILLA-HERNANDEZ previously used another driver to transport the "Treinteras" to and from prostitution dates, and he identified the driver as DURAN-MOTA. CI 2 reported DURAN-MOTA drove a silver Chrysler when transporting the "Treinteras." In 2017, DURAN-MOTA did have a silver Chrysler registered to him.

25.     BONILLA-HERNDEZ sold the gold Camry to ELIAZAR DURAN-MOTA, and DURAN-MOTA registered the vehicle in his name on March 16, 2018. After the vehicle was sold to DURAN-MOTA, the gold Toyota was observed by law enforcement on multiple occasions arriving at BONILLA-HERNANDEZ' residence on West Nettle Tree at around noon, picking up a female, driving away, and dropping the female off at West Nettle Tree around midnight each weekday. Investigation revealed that every week there was a different female being picked up at the residence by the gold Toyota. On one occasion, law enforcement observed the gold Toyota dropping a female

off at the West Nettle Tree residence with suitcases before noon. The female went inside the residence, dropped off her luggage, and then got back in the gold Toyota.

26. On April 12, 2018, law enforcement observed the gold Toyota registered to DURAN-MOTA arriving at the residence on West Nettle Tree Road. Thereafter, a Hispanic female, FEMALE 4, entered the vehicle, and the vehicle drove away. Law enforcement followed the vehicle, and eventually conducted a traffic stop. The driver of the gold Toyota was identified as DURAN-MOTA, and FEMALE 4 was fully identified. FEMALE 4 did not speak any English, but she was able to communicate her identifying information. She provided 646-283-9316 (SUBJECT TELEPHONE NUMBER 3) as her telephone number, and database searches confirmed the telephone number provided was registered to her.

27. A telephone number, 202-378-4905 (SUBJECT TELEPHONE NUMBER 2) had been previously identified for DURAN-MOTA through database searches, and DURAN-MOTA provided that telephone number to law enforcement during a recent incident. SUBJECT TELEPHONE NUMBER 2 was also in frequent contact with SUBJECT TELEPHONE NUMBER 1.

28. On May 8, 2018, call detail records from T-Mobile were received for telephone number 202-378-4905 (SUBJECT TELEPHONE NUMBER 2) belonging to DURAN-MOTA. Analysis of these records revealed that DURAN-MOTA was in contact with different telephone numbers each week, usually from Monday until Saturday. Each of these numbers is believed to be associated to each of the females he was transporting for that particular week.

29. Cell phone analysis reveals some of the women being prostituted traveled from various parts of the country to Union Station in Washington, D.C. Thereafter, cell phone analysis reveals the women in Northern Virginia for about a week. For example, from April 9, 2018 until

April 14, 2018, DURAN-MOTA was in contact with two telephone numbers belonging to FEMALE 4. Telephone records received for SUBJECT TELEPHONE 3 belonging to FEMALE 4 revealed SUBJECT TELEPHONE 3 traveled from Philadelphia, PA to Washington, DC in the vicinity of Union Station. The telephone remained in the vicinity of Union Station for approximately 45 minutes. The phone later communicated with a cell tower in Sterling, VA. The phone remained in Northern Virginia through April 14, 2018. The phone hit off a cell tower in Washington, DC in the vicinity of Union Station just after midnight on April 15, 2018. The next cell tower the telephone communicated with was in Philadelphia, PA later on April 15, 2018.

30. CS 1 met with BONILLA-HERNANDEZ, and BONILLA-HERNANDEZ disclosed to CS 1 some specifics about running a prostitution business. In an undercover recording, BONILLA-HERNANDEZ explained to CS 1 that it is easy to get clients, and that it required printing up business cards with a telephone number, handing out the cards to men on street, and telling them "Hey, cuz, here's a card for the little girl, for whenever you want."

31. BONILLA-HERNANDEZ explained getting the women for the prostitution was different, and you needed to have contacts. CS 1 asked BONILLA-HERNANEZ what he did to get the women, and BONILLA-HERNANDEZ related it was by word of mouth. BONILLA-HERNANDEZ told CS 1 that the women he used were generally between 21 and 30 years old. BONILLA-HERNANDEZ also related he travels to Union Station to pick up the women. BONILLA-HERNANDEZ explained that the only person who can control the women is usually their husband. BONILLA-HERNADNEZ added that the Mexican women usually have their pimps [chulos, in Spanish], but that they usually get away from their pimps when they arrive "here." BONILLA-HERNANDEZ mentioned that he had a Mexican guy working for him as well.

32. On July 6, 2018, state search warrants for the residences and vehicles of BONILLA-

HERNANDEZ and DURAN–MOTA were obtained out of Loudoun County and executed. During the search of BONILLA-HERNANDEZ' residence, a female who worked in prostitution, FEMALE 5, was recovered. FEMALE 5 stated she used telephone numbers 929-328-5890 and 347-730-2573.

33. FEMALE 5 provided a statement to law enforcement. FEMALE 5 is an undocumented alien from Mexico. FEMALE 5 arrived at the residence on W. Nettle Tree Road, Sterling, VA on Monday, July 2, 2018. She was picked up in Maryland by a Hispanic male she knew as "Commandante" in a Santa Fe [believed by law enforcement to be BONILLA-HERNANDEZ], and he transported her to the residence in Sterling, VA. Later that day, another male in a gold car, [believed by law enforcement to be DURAN-MOTA] picked up FEMALE 5 from the residence and drove her around to various prostitution dates.

34. On Tuesday, Wednesday, and Thursday, "Commandante" [BONILLA-HERNANDEZ] drove FEMALE 5 around to the prostitution dates. Each prostitution date was $40, and FEMALE 5 provided all the money she received to the drivers [BONILLA-HERNANDEZ and DURAN-MOTA] at the end of each date. FEMALE 5 was supposed to receive half of the money from all the prostitution dates on Saturday. FEMALE 5 estimated she conducted approximately 15 prostitution dates a day. FEMALE 5 was unable to identify photographs of DURAN-MOTA and BONILLA-HERNANDEZ as either Commandante or the other driver.

35. On July 6, 2018, BONILLA-HERNANDEZ and DURAN-MOTA were arrested on prostitution charges from Loudoun County. BONILLA-HERNADNEZ was arrested during a traffic stop, and he had been driving the Hyundai Santa Fe. DURAN-MOTA was arrested at his residence. The search warrants of their residences and vehicles commenced after their arrests. During the search warrants, multiple cellular telephones were collected.

36. A cooperating witness (CW) informed law enforcement BONILLA-HERNANDEZ

had approximately three telephones he used. The CW identified the devices as an iPhone, a Blackberry, and a Samsung, and CW advised BONILLA-HERNANDEZ had an Apple laptop. The CW knew BONILLA-HERNANDEZ ran a prostitution business, but CW did not know the purpose of each telephone BONILLA-HERNANDEZ possessed.

37. Another cooperating witness (CW 2) disclosed DURAN-MOTA was involved in the prostitution business, and his job was to drive the prostitutes to the prostitution dates. DURAN-MOTA earned approximately $700 to $800 in cash each week. CW 2 used a telephone, iPhone X with case and property receipt number FC2, to communicate with DURAN-MOTA. CW 2 used an application on the iPhone X to track DURAN-MOTA's telephone location, and CW 2 reported DURAN-MOTA primarily worked in the Sterling, Herndon, and Reston area. CW 2 advised there was a raise in the price of the prostitution services recently. The price went from $35 for 15 minutes to $40 for 15 minutes for the Hispanic clients, and for the non-Hispanic clients the price was now $45 for 15 minutes. CW 2 reported BONILLA-HERNANDEZ was the program manager for the prostitution business, and DURAN-MOTA worked for BONILLA-HERNANDEZ. Based on telephone records, DURAN-MOTA's telephone was in frequent contact with each prostitute he drove around each week, and it was also in frequent contact with SUBJECT TELEPHONE NUMBER 1.

38. CW 2 also stated BONILLA-HERNANDEZ provided DURAN-MOTA with a Blackberry that was used for the prostitution business. BONILLA-HERNANDEZ would hand out business cards with a telephone number that was connected to the Blackberry, and when a client called the number on the business card, they would communicate with DURAN-MOTA who would drive the prostitute to the client. During the search of the Hyundai Santa Fe, little business cards were located, and they stated the following information "D.J. COLOCHO", "571-525-8903", and

11

"Mejores y Buenas". The number on the card is SUBJECT TELEPHONE NUMBER 1. CW stated on occasion, BONILLA-HERNANDEZ would keep the Blackberry telephone, and he would send a text message to DURAN-MOTA's personal telephone with the times and locations of the prostitution dates.

39. In August and October, 2018, FEMALE 4 was interviewed by law enforcement. FEMALE 4 was initially hesitant to talk to law enforcement and initially denied being involved in prostitution, and initially stated she was visiting a friend in Virginia and sightseeing. After being confronted with information known to investigators, FEMALE 4 admitted to traveling to Virginia from Philadelphia, PA by bus to work as a prostitute on at least two occasions. FEMALE 4 identified BONILLA-HERNANDEZ and DURAN-MOTA as being involved in the prostitution business. She knew BONILLA-HERNANDEZ as "Luis", and she knew DURAN-MOTA as "Jonathan." On the most recent visit, FEMALE 4 arrived at Union Station in Washington, D.C. by bus, and she was picked up in a silver vehicle and taken to the residence in Sterling, VA. DURAN-MOTA transported FEMALE 4 to the prostitution dates, and she provided all the money to him at the end of each date. The price for each date was $40, and the arrangement was that FEMALE 4 would be paid at the end of the work week, Saturday. The first time FEMALE 4 worked in Sterling, VA, she was paid approximately $800, and the price for each date was $35.

40. Additionally, FEMALE 4 informed the government she stayed at BONILLA-HERNANDEZ's residence while working in prostitution. She also informed the government there was a time in which she stayed at DURAN-MOTA's residence for the week, and DURAN-MOTA drove her around to the prostitution dates. At the conclusion of the week, BONILLA-HERNANDEZ paid her a portion of the money earned through prostitution.

41. On October 23, 2018, FEMALE 3 was interviewed by law enforcement. FEMALE

3 traveled by bus from Philadelphia to Washington, D.C., and she would be picked up by BONILLA-HERNANDEZ or DURAN-MOTA and transported to the residence in Virginia. FEMALE 3 had been transported by both BONILLA-HERNANDEZ and DURAN-MOTA to residences for prostitution dates. FEMALE 3 stayed at BONILLA-HERNANDEZ' residence on at least 3 occasions, and she stayed at DURAN-MOTA's residence on one occasion. FEMALE 3 would typically work Monday through Saturday. The last time FEMALE 3 was at BONILLA-HERNANDEZ' residence to work in the prostitution business the price for each prostitution date was $40. FEMALE 3 gave all the money to the driver after each prostitution date, and she would be paid at the end of the week by BONILLA-HERNANDEZ, which was Saturday.

42. Based on the facts outlined above, there is probable cause to believe that from or around August 2017 through July 6, 2018, BONILLA-HERNANDEZ, and DURAN MOTA engaged in interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952; coercion and enticement in violation of 18 U.S.C. § 2422(a) transporting individuals in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2421; and bringing in and harboring certain aliens in violation of 8 U.S.C. § 1324.

Laura R. Calvillo
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 7th day of November 2018.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

Honorable Michael S. Nachmanoff
United States Magistrate Judge